UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT PALACIO VELLANOWETH,

Petitioner,

v.

JOE A. LIZARRAGA,[1]

Respondent.

No. 2:12-cv-0460 CKD P

ORDER

Petitioner, a California prisoner proceeding with counsel, is proceeding with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On July 10, 2008, petitioner was convicted in the Superior Court of Sacramento County of four counts of gross vehicular manslaughter while under the influence of alcohol (counts 1 through 4), one count of causing bodily injury while driving under the influence (count 5) and one count of causing bodily injury while driving with .08 percent alcohol in his blood (count 6). Petitioner is now serving a sentence of 17 years and 8 months imprisonment. The only claim which remains is the claim identified as claim "II" in the amended petition filed June 28, 2013. There are three unrelated subparts under the heading claim "II." The parties have consented to have all matters in this action before a United States Magistrate Judge. See 28 U.S.C. § 636(c).

[1] Warden Lizarraga, the warden at petitioner's place of incarceration, is hereby substituted as the respondent in this action. See Answer, note 1.

I. Background

On direct appeal, the California Court of Appeal, Third Appellate District, summarized the evidence presented at petitioner's trial as follows:

> The collision occurred at approximately 3:40 p.m. on March 26, 2007. The bartender at The Distillery testified that defendant arrived at her establishment around 11:30 a.m., and she served him three martinis. Defendant left around 1:30.
>
> Defendant went back to his office, arriving around 1:45 p.m. He left the office around 3:30 and went to the El Camino Real restaurant, next door. He stayed less than 10 minutes before leaving, eventually heading South on South Land Park Drive.
>
> Tanisha Jackson, who was 16 at the time, testified that she and her friend Brittanya Nash were picked up from their high school that day by Brittanya's sister, Brizchelle. Also in the car were Brizchelle's baby son Kamall, and friend Shanice Carter. They first stopped at a Food Stop convenience store, then were going to pick up Brizchelle's other son from school. Jackson, the only survivor, remembered nothing after leaving the Food Stop.
>
> Several witnesses heard, but did not see the crash. It had been raining that day, and the street was still wet. Lloyd Need was parking in a parking lot facing the intersection of South Land Park Drive and 35th Avenue, when he heard the squealing of tires and revving of an engine. He looked up and saw defendant's red jeep spinning its tires and fishtailing. The engine of the Jeep sounded like it was being floored. The Jeep was headed south on South Land Park Drive. Need did not continue to watch the Jeep, but a "very short period of time" later, he heard a huge, ground shaking thud. He observed Rice's brown sedan in the northbound lane sitting sideways in the street. The front end of the car was "totally smashed." Further down in the southbound lane, he saw the red Jeep. He went back to his truck and dialed 911.
>
> Sharon Williamson was getting out of her mother's car to mail some letters when she heard tires spinning out. She looked around and saw Rice's brown sedan in the street. It was headed north after appearing to have exited from the southernmost exit from the parking lot. She continued on towards the post office, then heard a huge collision. She looked over quickly enough to see the impact as it was still happening. The red Jeep was on top of the brown car. The Jeep landed right side up in the gutter and the sedan landed across the street almost on someone's lawn.
>
> Jerry Kwong was working at a nearby store when he heard a loud, thundering sound. He looked out the front door and saw the Jeep at an angle. He eventually saw the other car on the lawn facing the wrong direction. He helped the driver of the Jeep get out of the vehicle, then went to the other car. He realized he could not help the driver of the other car because it was apparent she was dead.

Jordan Lindsey lived nearby. He heard the screeching tires first, then a tremendous impact. He ran outside and saw the sedan on his neighbor's lawn. He saw only three people in the car. He could tell the passenger in the front seat was dead. One of the passengers in the back was breathing, but not moving. Nothing could be done to help the driver. He wanted to help the passenger he knew was still alive, but the condition of the car was such that he was unable to get to her.

James Keating was shopping at a nearby grocery store. He was in the store when someone said there had been a fatal crash outside. He went to see if he could help. He saw defendant sitting in the passenger seat of the Jeep. He asked defendant if he were all right. Defendant indicated he was. He asked who had been driving, and defendant replied that his wife had been driving. He asked where defendant's wife was, and defendant said, "She got out and walked home."

Firefighter Robert Wenzler was the first emergency responder to speak with defendant. Defendant was outside the vehicle walking around. Wenzler testified that defendant told him he was the passenger in the Jeep, and that his wife had been driving. Wenzler asked defendant where his wife was, and defendant told him she was in Arizona.

Wenzler started asking defendant questions to assess his condition. Defendant was irate and upset, and did not want to answer any questions. Defendant told Wenzler to go fuck himself. Defendant's speech was slurred, and Wenzler detected the order of alcohol. After the police came, Wenzler tried to convince defendant to get in an ambulance and be evaluated. Defendant was uncooperative, and told Wenzler he did not have to cooperate because he (defendant) was a peace officer.

Police officer Lee Elson was dispatched to the scene of the accident. He noticed the odor of alcohol on defendant's breath. Defendant told Elson he was a retired CDC parole agent, and showed Elson his badge. Defendant told Elson he had been driving southbound on South Land Park Drive when the sedan "blew a red light and hit him." Elson knew this was impossible because there was no light at that intersection. Defendant did not recall how fast he had been going or what direction the other car had been coming from. Defendant told Elson he had had one alcoholic drink.

Police officers Jyotis Hasegawa and Shannon Whent also responded to the scene. Hasegawa testified that he smelled a strong odor of alcohol coming from defendant, that defendant's speech was slurred, and that his eyes were bloodshot and watery. Defendant told Whent he had been coming home from the El Camino Real restaurant. He told her he had been driving. He told her he had not had anything alcoholic to drink.

Officer Whent attempted to perform field sobriety tests on defendant. The first test performed was the Horizontal Gaze Nystagmus test. The test evaluates the bouncing of the eye as it

tracks the movement of a pen or fingertip. Defendant was uncooperative and would not stand still. When Whent attempted to repeat the test and reinstructed defendant, he once again failed to follow instructions.

Whent also told defendant to stand on one leg, but he would not do it. Defendant refused to provide a breath sample for testing. Whent concluded there was probable cause to believe defendant was under the influence.

Defendant was uncooperative and had to be handcuffed to a gurney to be taken to the hospital. At the hospital, Whent advised defendant that he was required to submit to a blood alcohol test and that he did not have the right to refuse. Defendant's response was that he wanted an attorney and that he would not give a blood sample. According to procedure, the forced blood draw was videotaped and the tape was played for the jury.

After the blood sample was taken from defendant, he told Whent that his foot slipped off the brake and he hit the gas, that "it must have been a hell of an impact," and "just take me to jail." Defendant told Hasegawa, "I went to the Camino Real restaurant and had a drink possibly called a Kamikaze. It was a large drink, and it contained rum. I made a bad choice. I hadn't eaten anything and then I drove home. I normally don't drink alcohol. I approached a stop sign and didn't even see what happened."

Around midnight, defendant told a nurse, "they hit me, it was not my fault, I am glad to be alive." He said "they" ran a stop sign. He also said he had not had anything to drink.

The forced blood draw was taken at 5:48 p.m., approximately two hours after the accident. The sample contained a blood alcohol concentration of .16 percent. With a blood alcohol concentration of .16 percent, a person absolutely would be mentally impaired.

The term "drink equivalent" is used to describe a standard drink. A drink equivalent contains a half ounce of pure alcohol. A 12-ounce beer, a four ounce glass of wine, an ounce-and-a-half of 80-proof alcohol, and an ounce of 100-proof alcohol are all one drink equivalent. Assuming defendant had no alcohol from the time of the crash to the time of the blood draw, he would have had to have drank a minimum of 11 drink equivalents in a very short time frame just before the crash to reach a .16 level two hours later. The three martinis that defendant was proven to have consumed between 11:30 and 1:30 would have resulted in an approximate alcohol concentration of .03 percent at 3:39 p.m. To arrive at a .16 level two hours later, defendant also would have had to have consumed a minimum of nine and one-half drink equivalents just before the crash. This is the equivalent of 12 ounces of 80 proof alcohol.

Douglas Tracy, an officer with the Sacramento Police Department's major collision investigation unit, testified to his reconstruction of the accident. He stated that the collision occurred in the northbound lane of traffic. Defendant's Jeep was traveling

southbound, and the victims' Chrysler LaBaron was traveling northbound. The vehicles hit head-on. The Jeep's speed was between 66 to 76 miles an hour at the time of impact. The event data recorder in defendant's jeep confirmed that it was traveling 66 miles an hour two seconds before the crash and accelerated to 72.08 miles an hour. Defendant never applied his brakes. The Chrysler's speed was between 18 and 24 miles an hour. The posted speed limit was 30 miles an hour.

Brizchelle Rice suffered massive injuries. Her spinal cord was torn in half, which was immediately fatal. Her heart was lacerated, also fatal. She suffered potentially fatal injuries, including a lacerated liver, pelvic injuries, a lacerated arm and a mangled leg. Had she lived, her arm likely would have been amputated. She had no alcohol in her system.

Shanice Carter also suffered numerous injuries, a pinched spinal cord being fatal. Brittanya Nash also suffered multiple injuries, including fatal lacerations of the heart and vena cava, and a severed aorta. Kamall Osby was 19 months old. He, too, suffered numerous injuries, including a fatal skull fracture and brain injury. Tanisha Jackson suffered multiple serious injuries but survived.

Defendant testified on his own behalf. He confirmed having three martinis between 11:40 a.m. and 1:30 p.m. He claimed he went to the restaurant (El Camino Real) next door to his office around 3:30 to visit the owner, who was his client. Mr. Garnica, defendant's client, was not at the restaurant, but his daughter Angelia, offered him a drink. He asked for a Horchata, which is a sweet rice drink. The drink Angelia handed him was not white, like a Horchata, but was orange and pink. He was told by Mrs. Garnica (Angelia's mother) that the drink was a virgin kamikaze, which he thought meant it had no alcohol. The drink tasted like orange juice with triple sec in it, but he did not taste any alcohol.

After drinking the drink, he got in his car and proceeded to South Land Park Drive. He recalled stopping at the stop sign at 35th Avenue and South Land Park Drive. While he was stopped, a car came up next to him on the right shoulder of the road. He accelerated out of the stop in order to get ahead of the car on the right, exceeding the speed limit. He saw a car coming directly at him in his lane, so he swerved into the northbound lane, accelerating as he did so. Simultaneously, the other vehicle moved into the northbound lane. He turned as quickly as he could, but there was no way to avoid the crash. He told the jury, "You have to remember, this is an accident, it's nobody's fault."

Defendant claimed he remembered nothing from the time of the impact until he woke up in a hospital room with a police officer. He told the police officer there was nothing he could have done to prevent the accident.

Angelia Garnica testified that defendant did not have anything to drink when he stopped by the restaurant the afternoon of the accident. Antonio Garnica, who had not been at the restaurant

when the defendant stopped by, testified that his wife told him defendant had been served a punch drink. Mrs. Garnica was deceased at the time of trial.

Defendant hired an accident reconstruction expert to testify that the accident could have happened as defendant claimed it did. The expert conceded that there were a lot of different trajectories for the Jeep which would have resulted in the Jeep being in the correct position following the impact. Also, the expert assumed the Chrysler had been exiting the parking lot from the exit nearest the accident, when the only eyewitness to the Chrysler leaving the parking lot (Williamson) indicated the Chrysler exited the lot further south.

Defendant also hired a forensic toxicology expert who opined that defendant's blood alcohol concentration at the time of the collision was .045 percent. To explain defendant's .16 blood alcohol concentration two hours after the accident, the expert theorized that defendant suffered an abdominal injury which blocked the digestion from the abdomen, known as dynamic ileus, slowing the absorption of alcohol into the bloodstream.

The expert testified that the hospital drew a second blood sample from defendant at approximately 7:20 p.m. the date of the accident. Unlike the whole blood analysis done by the police department, the hospital analyzed only the plasma. To equate a whole blood analysis to plasma analysis, one must multiply by a factor of .89. Having done this calculation, the expert determined that defendant's blood alcohol concentration from the second test was .17.

This would mean that defendant's blood alcohol concentration was rising. Normally, if defendant had consumed eight to nine ounces of 80-proof alcohol, the amount necessary to result in a blood alcohol concentration two hours later of .16, he would have reached maximum absorption into the bloodstream within 45 minutes to an hour. Thus, if he consumed the alcohol at approximately 3:30 p.m., his highest blood alcohol level would have occurred from 4:15-4:30 p.m. The fact that the alcohol levels were rising, rather than falling, was explained by dynamic ileus.

On cross exam, the expert admitted defendant would have had to have consumed 12 ounces of 80-proof alcohol just before the accident, not eight or nine ounces. The expert also admitted that the hospital records for defendant indicated he had not had abdominal trauma or tenderness, and that his abdominal exam was unremarkable. Also on cross-examination, the expert agreed that any given plasma or serum alcohol concentration reflects a range of possible whole blood concentrations. He admitted to some familiarity with studies indicating plasma tests for alcohol showed a range of results.[2]

---

[2] The prosecutor questioned the expert about studies showing that the amount by which a plasma concentration must be divided to obtain a whole blood concentration range from .95 to 1.40. The

> The expert also opined that defendant behaved like a person suffering from a closed head injury or post concussive syndrome, but not someone with a .16 blood alcohol concentration. He also claimed that he saw no Horizontal Gaze Nystagmus when looking at defendant's blood draw video. However, the Horizontal Gaze Nystagmus test was not performed on defendant during that video.
>
> Defendant also hired a neuropsychologist who opined that defendant's post-collision behavior indicated traumatic brain injury, not alcohol dementia. She admitted, however, that alcohol dementia results from fairly long term use of alcohol. Saying he did not suffer from alcohol dementia did not mean he could not have suffered from overuse of alcohol on the date in question. The neuropsychologist admitted that defendant was given a CT scan that showed no fracture and no acute intracranial abnormality.

ECF No. 1 at 18-28.

The Court of Appeal affirmed petitioner's convictions and sentence. ECF No. 1 at 50. The California Supreme Court denied petitioner's request for review of that decision without comment. ECF No. 15-1 at 16. Petitioner filed several requests for collateral relief in California's courts, all of which were denied.

II. Standard For Habeas Corpus Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). Also, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)." It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

---

hospital lab result showed defendant's plasma concentration was .192. Thus, the range of whole blood alcohol concentration based on these expert studies would have ranged from .20 to .137, making it possible that defendant's blood alcohol level was declining at the time of the second test.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

When a state court rejects a federal claim without addressing the claim, a federal court presumes the claim was adjudicated on the merits, in which case § 2254(d) deference is applicable. Johnson v. Williams, 133 S. Ct. 1088, 1096 (2013). This presumption can be rebutted. Id.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. "Clearly established" federal law is that determined by the Supreme Court. Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004). At the same time, it is appropriate to look to lower federal court decisions as persuasive authority in determining what law has been "clearly established" and the reasonableness of a particular application of that law. Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at

782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court precedent is misplaced).

III. Petitioner's Remaining Claim And Analysis

As indicated above, the only remaining claim is the claim identified as claim "II" in petitioner's amended petition for writ of habeas corpus. There are three subparts to the claim:

A. Limitation on Testimony of Sharon Williamson

Again, the California Court of Appeal summarizes the trial testimony of Sharon Williamson as follows:

> Sharon Williamson was getting out of her mother's car to mail some letters when she heard tires spinning out. She looked around and saw Rice's brown sedan in the street. It was headed north after appearing to have exited from the southernmost exit from the parking lot. She continued on towards the post office, then heard a huge collision. She looked over quickly enough to see the impact as it was still happening. The red Jeep was on top of the brown car. The Jeep landed right side up in the gutter and the sedan landed across the street almost on someone's lawn.

Before her testimony Ms. Williamson indicated that Ms. Rice was driving to "beat the Jeep" as she pulled out of the parking lot where Ms. Williamson was. This testimony was excluded by the trial court as speculative:

> I do note, and I wanted to make sure that that witness apparently also says that it appeared that she was driving to beat the Jeep, which as far as I can tell would not be admissible evidence because it would be speculating about the state of mind of the person in the Chrysler. So it doesn't appear to me that would be evidence.

RT at 61.

This claim was not raised on direct appeal and was raised for the first time in this action in the amended petition for writ of habeas corpus. In an order issued July 31, 2014, the court dismissed all claims by petitioner which were not raised on direct appeal and raised for the first time in petitioner's first amended petition as time-barred. While respondent sought dismissal of this claim, ECF No. 15 at 7 & 18, the court did not recognize the claim, and accordingly did not rule on respondent's request.[3] For the reasons stated in the court's July 31, 2014 order,

---

[3] Again, the claim concerning the limitation on the testimony of Ms. Williams appears under the heading claim "II" in petitioner's amended petition as do the other claims addressed herein. In

petitioner's claim concerning the limitation of the testimony of Sharon Williamson is also time-barred and the court does not reach the merits of the claim nor address respondent's assertion that the claim is procedurally defaulted, ECF No. 35 at 17-24.

B. Brizchelle Rice Did Not Have A Driver's License

The trial court refused to allow petitioner to present evidence indicating that on the date of the accident that took her life, Brizchelle Rice did not have a driver's license. Petitioner asserts this deprived him of his Constitutional rights.

The trial court excluded the evidence finding that whatever limited relevance the evidence had was outweighed by prejudice:

> Whether the driver of the Chrysler had a driver's license or not, it seems to me has no relevance or what very little relevance it has is outweighed by prejudicial effect. There are people who have driver's licenses and are terrible drivers, and there are people who have no licenses and are fine drivers. I don't think having or not having a license bears any rational connection to how well [Ms. Rice] was driving at the time of the crash.
>
> The extent that it does, I think the prejudicial effect of confusing the issue and the potential for the District Attorney to show, well, despite the fact that she has – didn't have a license, she is a good driver, outweighs what little probative effect it has.

RT 65-66.

On direct appeal, the Court of Appeal agreed that whether Ms. Rice had a driver's license was not relevant:

> We conclude that the absence of a driver's license is not relevant to the issue of negligence of the driver in causing a particular accident, unless the absence of the license contributed directly to the injury. In this case there was no evidence showing that the absence of a license had anything to do with the accident. For these reasons, such evidence was not relevant, and it was inadmissible for the purpose of proving negligence.

ECF No. 1 at 31.

/////

---

the court's review of claim "II" for purposes of respondent's motion to dismiss, the court simply did not recognize that claim "II" contained a claim other than the two claims addressed herein and raised in petitioner's original petition for writ of habeas corpus.

It is clearly established by the Supreme Court that trial court judges have the authority to exclude evidence if probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury. Holmes v. South Carolina, 547 U.S. 319, 326 (2006). Also evidence that is only marginally relevant or repetitive is also excludible. Id. at 326-27. Petitioner fails to point to any authority indicating that the exclusion of the evidence in question or the affirmance of the decision to exclude that evidence is somehow contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. Accordingly, petitioner is barred from obtaining relief under 28 U.S.C. § 2254(d) as to this claim.

C. "Permissive Inferences"

In order for jurors to enter a finding of guilt with respect to several of the offenses for which petitioner was charged, jurors were required to find that at the time of the accident petitioner either drove under the influence of alcohol or drove while having a blood alcohol level of 0.08 or higher. E.g. CT 582. With respect to those elements, jurors were further instructed as follows:

1. If the People have proved beyond a reasonable doubt that the defendant's blood alcohol level was 0.08 percent or more at the time of the chemical analysis, you may, but are not required to, conclude that the defendant was under the influence of an alcoholic beverage at the time of the alleged offense. CT 593 & 597.

2. If the People have proved beyond a reasonable doubt that a sample of defendant's blood was taken within three hours of the defendant's driving and that a chemical analysis of the sample showed a blood alcohol level of 0.08 percent or more, you may, but are not required to, conclude that the defendant's blood alcohol level was 0.08 percent or more at the time of the alleged offense. CT 595 & 598.

Petitioner argues that the two permissive evidentiary inferences (as opposed to mandatory presumptions) identified above "destroyed [petitioner's] Due Process Right" that jurors be required to find beyond a reasonable doubt whether he drove under the influence of alcohol or drove while having a blood alcohol level of 0.08 or higher before finding petitioner guilty of

offenses. However, with respect to all of the offenses for which defendant was convicted (counts 1-6), jurors were specifically informed: 1) that all elements of each offense have to be "proved;" and 2) whenever something has to be "proved," it has to be proved "beyond a reasonable doubt." CT 555. Nothing in the language of the permissive inferences identified above relieved jurors of their ultimate responsibility to find defendant guilty of an offense only if each element of the offense was proved beyond a reasonable doubt.

While it is not entirely clear, the court assumes petitioner is renewing an argument made on direct appeal that those instructions which contained the permissive inferences were defective because they should have reinforced, in the language of the instruction themselves, that every element had to be proved beyond a reasonable doubt. See Respondent's Lodged Doc. No. 14, at 21-22. However, petitioner fails to point to any Supreme Court authority indicating that if an instruction includes a permissive inference it must also include a reminder that each element of an offense must be proved beyond a reasonable doubt.

Finally, the court notes that the Supreme Court has specifically held that "permissive inferences," such as the ones at issue here, do not violate federal law as long as "there is no rational way the trier could make the connection permitted by the inference." County of Ulster, N.Y. v. Allen, 442 U.S. 140, 157 (1979). As held by the Court of Appeal, petitioner has failed to show that there was no rational way the jury in this case could have made the inference from evidence presented indicating petitioner's blood alcohol level when tested was 0.16 that he was under the influence at the time of the accident or that his blood alcohol level was 0.08 at the time of the accident. ECF No. 1 at 40-41.

In light of the foregoing, and because petitioner has not shown that he is not precluded from obtaining relief as to his permissive inference claim by 28 U.S.C. § 2254(a), petitioner's final claim must be rejected.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Petitioner is denied a writ of habeas corpus as to all remaining claims;

2. This case is closed; and

/////

3. The court declines to issue the certificate of appealability referenced in 28 U.S.C. § 2253.

Dated: June 24, 2015

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

1
vell0460.157(2)